UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILHELM I. WADE, SE'MONE M. WADE, and TIRAE L. DOTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 C 9022 |
| | ) | |
| IVAN I. RAMOS, SALVATORE REINA, JOHN W. FRANO, MARVIN J. BONNSTETTER, KEVIN GARCIA, MICHAEL A. NAPOLI, VITO P. RAIMONDI, TONIA M. MORIN, JOSEPH M. ROMAN, JENNIFER L. TERZICH, LAWRENCE O. STUCKERT, SANTOS T. REYES, JR., and CITY OF CHICAGO, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD AMENDED MEMORANDUM OPINION AND ORDER

Relying on information from a "J. Doe" informant, Chicago Police Officers obtained a warrant to search the apartment of Terrell Johnson in September 2015. Johnson's apartment is one flight upstairs from street level, but is in fact a first-floor apartment. Perhaps because of this configuration, the officers requested and obtained a warrant to search a second-floor apartment, ultimately entering a unit upstairs from Johnson's that belonged to Plaintiffs Wilhelm and Se'Mone Wade. This federal lawsuit followed. The Wades allege that the officers sought and obtained an invalid warrant, executed it unreasonably, and unlawfully seized them during the search. They have also brought a related *Monell* claim against the City of Chicago. Plaintiff Dotson, who was arrested during the search, additionally alleges that he was subjected to a false arrest and malicious prosecution. The Officers and the City of Chicago now move for partial summary judgment. For the reasons stated herein, the motion is granted.

## STATEMENT OF FACTS

This case centers on the September 2015 search of a two-story apartment building located at 4131 West Crystal Street in Chicago, Illinois, conducted by Chicago Police Department ("CPD")

officers. The apartment building contains four units: two front units, with their own entrance and stairwell, and two rear units, with their own entrance and stairwell. (Pl. 56.1 [292] ¶ 2.) (Mecher Jr. Dep. at 25-26, Ex. H. to Def. 56.1 [265].) Only the two front units—a lower and upper unit—are relevant to this case. At all relevant times, a man named Terrell Johnson resided in the lower front unit (the "Johnson Unit"). (Mecher Sr. Dep. at 13-16, Ex. G to Def. 56.1.) To reach the Johnson Unit, one must enter the apartment complex and ascend one flight of stairs. (Pl. 56.1 ¶ 37.) Plaintiffs Wilhelm Wade and his daughter, Plaintiff Se'Mone Wade, resided in the upper front unit (the "Wade Unit"). (Def. 56.1 ¶¶ 69-70.) To reach the Wade Unit, one must ascend an additional flight of stairs from the Johnson Unit's entrance. (Wilhelm Wade Dep. at 83-88, Ex. J to Def. 56.1.) At the time the search was executed, a "2" was affixed to the front door of the Wade unit. (Def. 56.1 ¶ 26.)

## A.    The Search Warrant

The search was precipitated by information provided by a registered cooperating individual (an "RCI"). (Pl. 56.1 ¶ 35.) The informant, referred to as "J. Doe," was registered as an RCI in approximately 2005 or 2006 with the assistance of Defendant John Frano, a CPD officer. (Def. 56.1 ¶ 57.) Doe thereafter provided information to Frano on a number of occasions; Frano estimates that Doe provided him information some 250 to 300 times and that Frano spoke with Doe approximately 600 to 1200 times prior to the search at issue in this case. (Def. 56.1 ¶ 66.) Doe also cooperated with Defendant Ivan Ramos, a CPD sergeant. (*Id.* ¶ 63.) Prior to this search, Ramos testified, Doe assisted him with 20 to 40 other search warrants, of which Ramos estimates that "over 90 percent" led to an arrest. (Ramos Dep. at 162-65, Ex. A to Def. 56.1.) Ramos did not compensate Doe in any of these cases, and claims that Doe cooperated out of Doe's stated desire to "clean up the streets." (Def. 56.1 ¶¶ 65, 67.) Ramos has never reviewed Doe's RCI file and is unaware whether it contains anything that would bear negatively on Doe's credibility. (*Id.* ¶ 62.)

As part of his cooperation, Doe met with Ramos on September 14, 2015. (*Id.* ¶ 3.) During that meeting, according to Ramos, Doe relayed to him the following information: Earlier that day, Doe had purchased "a couple" bags of heroin from a man named "Swami." (*Id.* ¶¶ 3-4.) Doe said that he had previously purchased heroin from "Swami" three or four other times. (*Id.* ¶ 3.) The September 14 transaction took place in what Doe understood to be "Swami's" apartment, situated in the "2nd floor" of a building located at 4131 West Crystal Street. (*Id.* ¶ 3, 9; Search Warrant at 1, Ex. A to Def. 56.1.) Doe recounted that, after entering through the front door of "Swami's" apartment, Doe walked through the living room to a bedroom in the back of the unit. (Def. 56.1 ¶¶ 10-11.) Inside the bedroom, Doe saw "Swami" remove a clear plastic bag from the bedroom closet. (*Id.* ¶ 12.) That bag contained 20-50 smaller clear plastic bags containing heroin, several of which Doe purchased from "Swami." (*Id.*) Doe then left through the front door. (*Id.* ¶ 10.) Doe was in the unit no more than five to fifteen minutes. (*Id.* ¶ 4.)

After Doe shared this information, Ramos drove with Doe to the apartment located at 4131 West Crystal Street. (*Id.* ¶ 13.) Doe identified the unit he had entered by pointing to the second floor of the building and stating that he had entered the front door of the complex, gone up to the second floor, and purchased heroin from "Swami" there. (*Id.* ¶ 13.) In a sworn complaint (referred to here as "criminal complaint") that he prepared later, Ramos wrote that he retrieved a photograph of Terrell Johnson from the Chicago Police Department Data Warehouse and showed this to Doe, and Doe identified the man in the photograph as "Swami."[1] (Search Warrant at 2.) Ramos testified that he also "pull[ed] pictures of the residence." (Def. 56.1 ¶ 6.) These photos

---

[1] When deposed, Ramos testified that he showed Doe an array of 10-15 photographs of people with the name Terrell Johnson, and Doe positively identified one with the known alias "Swami." (Ramos Dep. at 212-13.) There is no mention of a photo array in the criminal complaint that Ramos prepared, however. (Search Warrant at 1-2.) Rather, the complaint indicates that Ramos "was able to retrieve a photograph of Johnson" and "showed this picture to J. Doe." (*Id.*) Because Ramos's testimony is contrary to his prior admission, the court disregards it. (*See* Ramos Admissions ¶ 19.)

are not in the record, and the court is unaware of where they were "pulled" from.  Ramos took no other action to verify Terrell Johnson's address.  (*Id.* ¶ 7.)  All of the defendants, including Ramos, have made judicial admissions that they performed "no independent corroboration of the recitation by the 'J. Doe' witness of any details of any criminal activity occurring inside 4131 W. Crystal St., Chicago, Illinois . . . prior to the execution of the warrant on September 16, 2015."  (Pl. 56.1 ¶ 36.)

On or before September 16, 2016, Ramos drafted a criminal complaint in support of his request for a warrant to search Johnson and "the premises: 4131 W. Crystal 2nd floor apartment of a brown brick apartment building located in the City of Chicago, Cook County IL."  (*See* Search Warrant at 1-2.)  Ramos asserts that the criminal complaint contains "all grounds constituting probable cause to obtain a warrant."  (Pl. 56.1 ¶ 34.)  It includes the foregoing information about Ramos's September 14th meeting with J. Doe, but provides no details about Doe's background.  (*See* Search Warrant.)

Ramos believes that the criminal complaint "would have" first been approved by "Lieutenant Platt,"[2] but does not specifically recall receiving this approval, and although Ramos recognizes a signature on the criminal complaint as "a signature of a lieutenant," he does not recognize it to be Lieutenant Platt's.  (Def. 56.1 ¶¶ 14, 16; Ramos Dep. at 231-32; Ramos Answers to Interrog.'s ¶ 20, Ex. Z12 to Def. 56.1.)  Ramos believes the criminal complaint was also approved by the State's Attorney's office through Assistant State's Attorney Katheryn Roy, as he recalls faxing the criminal complaint to her, but he does not recognize any signature on the criminal complaint to be that of ASA Roy.  (Ramos Dep. at 233-34.)

Before the search warrant was approved, Ramos and Frano transported Doe in a squad car to the home of Cook County Circuit Judge Ursula Walowski, with Ramos in the driver's seat

---

[2]      The record is silent as to Lieutenant Platt's full name, although Frano testified that "[s]he was probably the watch commander."  (Ramos Dep. at 231.)

and Frano in the front passenger's seat.  (Def. 56.1 ¶ 17.)  Once at Judge Walowski's residence,

Frano exited the vehicle and Judge Walowski took his place in the front passenger seat.  (*Id.*)

Ramos handed Judge Walowski a draft search warrant, a copy of the criminal complaint, and a

print-out of J. Doe's criminal history.[3]  (*Id.*); (Search Warrant at 2.)  According to Ramos,[4] Judge

Walowski interviewed Doe and learned the following: (1) Judge Walowski asked how Doe knew

Johnson, and Doe responded that Johnson sold him drugs; (2) Judge Walowski asked when Doe

last purchased narcotics from Johnson, and Doe responded that it was two days prior; (3) Judge

Walowski asked how much heroin Doe had purchased, and Doe responded that it was "a couple

of bags;" (4) in answer to Judge Walowski's question, Doe acknowledged that he had been using

heroin for 8 to 10 years.  (Def. 56.1 ¶ 19.)  Ramos does not recall telling Judge Walowski that

Doe was registered as an informant.  (*Id.* ¶ 20.)  The meeting with the judge lasted no more than

15 minutes.  (*Id.* ¶ 21.)

The Search Warrant reflects that it was approved by Judge Walowski on September 16,

2015 at 7:05 p.m.  (Search Warrant at 3.)  It authorizes the search of "Johnson, Terrell AKA

'Swami,'" described as a 5'9" 180-pound black male born in 1976, and the premises at "4131 W.

---

[3]     Ramos testified that he additionally gave Judge Walowski a picture of the apartment and a picture of Terrell Johnson.  (Def. 56.1 ¶ 18.)  This conflicts with a judicial admission made by both Ramos and Frano that "[no] information outside of the supporting affidavit was given to [Judge Walowski] in support of [the] search warrant."  (Frano Admissions ¶ 20, Ex. 4 to Pl. SOF); (Ramos Admissions ¶ 20.)  Ramos's testimony to the contrary is disregarded.

[4]     Plaintiffs further argue that, based on Ramos's admission, the court should exclude evidence that Ramos provided Judge Walowski with Doe's criminal record.  The court notes, however, that the criminal complaint itself records that, "J. Doe's criminal history, including possible pending investigations if any, have been presented to the undersigned Judge," and is accompanied by Judge Walowski's signature.  (Search Warrant at 2.)

[4]     The substance of Judge Walowski's conversation with John Doe is a matter of contention.  Judge Walowski has not been subpoenaed, and Defendants asserted the informant's privilege to withhold Doe from discovery.  Accordingly, the only witness to this conversation whose recollections are in the record is Ramos.

Crystal 2nd Floor Apartment of a brown brick apartment building located in the City of Chicago, Cook County IL." (*Id*.) It additionally provides for the seizure of "any documents showing proof of residency, any paraphernalia used in the weighing, cutting, or mixing of illegal drugs, any money, [and] any records detailing illegal drug transactions which have been used in the commission of, or which constitute evidence of [unlawful possession of a controlled substance]." (*Id*.) There is no evidence that Doe himself reviewed either the search warrant or the criminal complaint before it was authorized or executed.

## B. The Search

Prior to execution of the search warrant, Ramos met with Frano and ten other officers who would execute the search warrant: Defendants Salvatore Reina, Kevin Garcia, Michael Napoli, Joseph Roman, Lawrence Stuckert, Santos Reyes Jr., Jennifer Terzich, Tonia Morin, and Vito Raimondi. (Def. 56.1 ¶ 24.) At this meeting, Frano provided pictures of Terrell Johnson and the premises. (*Id*.)

The search was executed on September 16, 2015—neither party has identified the time the search began, although presumably it was after 7:05 p.m. That evening, a friend of Wilhelm Wade's, Plaintiff Tirae Dotson, was in the Wade Unit. (Pl. 56.1 ¶ 3.) The parties' recollections of the events that transpired diverge significantly.

### 1. Defendants' Version of Events

Defendants assert that they entered the apartment complex through its front door, ascended the stairs to the second floor, and knocked on the front door of the Wade Unit. (Def. 56.1 [265] ¶ 28; Ramos Dep. at 248-50.) Several officers claim that, after knocking, they heard individuals running inside the apartment. (Def. 56.1 ¶ 29.) The officers then forced the door open and entered the Wade Unit. (*Id.* ¶ 30.) Ramos, Frano, and Bonnstetter recall observing "at least two male blacks" running toward the back door. (*Id.* ¶ 32.) The first of these men, Defendants

6

claim, was Pierre Nero, a mutual friend of Plaintiff Tirae Dotson and Terrell Johnson.[5] (*Id.* ¶¶ 34, 73-74.) Frano and Bonnstetter recall seeing Nero throw a plastic bag of narcotics on the Wade Unit's kitchen floor while running toward its back door. (*Id.* ¶¶ 34, 88.) The second individual was Tirae Dotson. Frano detained both Nero and Dotson on the back porch. (*Id.* ¶ 35.)

According to Bonnstetter and Frano, Bonnstetter relayed that he saw a third individual run out the back of the Wade Unit and run downstairs, entering the Johnson Unit through a back door. (Def. 56.1 ¶ 36.) Frano says he kicked open the rear door of the Johnson Unit in pursuit of this individual. (*Id.*) Once inside the Johnson Unit, Frano opened the front door of that unit, letting Ramos in. (*Id.*) A woman and several children were inside. (Def. 56.1 ¶ 38.) According to Frano, the woman told him that she was Terrell Johnson's girlfriend, and that Johnson had just run through the unit, but that she did not know where he went. (Frano Dep. at 254-55, Ex. R. to Def. 56.1.) Frano did not see Johnson in the unit. (*Id.*) While inside the Johnson Unit, Defendants saw narcotics in plain view. (Def. 56.1 ¶ 40.)

Dotson and Nero were handcuffed and seated in the dining room of the Wade Unit. (*Id.* ¶ 47.) Garcia and Napoli recall that, at this point, they patted down Dotson and Nero, although they do not recall which officer handled which individual. (Pl. 56.1 ¶ 23.) Bonnstetter also claims to have pat Dotson down, and Bonnstetter avers that he found five plastic bags containing narcotics in the front pocket of Dotson's pants. (Def. 56.1 ¶¶ 42-43.) It is uncontested that Bonstetter, Frano, and Ramos arrested Dotson for possession of cocaine. (Pl. 56.1 ¶ 22.)

---

[5] Wilhelm Wade testified that he has known Nero since they were children, and that Nero has attended 25-50 barbeques at 4131 West Crystal Street, but Wilhelm Wade nevertheless does not consider Nero a friend. (Wilhelm Wade Dep. at 32; Def. 56.1 ¶ 80.) Wade testified that Nero had never been in the Wade Unit prior to being brought inside by police on September 16, 2015 during the search. (Wilhelm Wade Dep. at 58); *see also* Statement of Facts, *infra*, at Section II. Plaintiff Dotson, on the other hand, does recall seeing Nero in the Wade Unit on a prior occasion, the details of which he does not recall. (Def. 56.1 ¶ 79.) One landlord, Gladstone Mecher Sr., testified that Nero was paying Johnson's rent for the first-floor unit, and the other landlord, Gladstone Mecher Jr., testified that he has seen Nero in the Johnson Unit. (*Id.* ¶¶ 82, 84.)

Although the precise length of the search is uncertain, Ramos testified that he believes it took approximately one hour in total.[6]  (Def. 56.1 ¶ 27.)

## 2. Dotson's Version of Events

According to Dotson, he arrived at the Wade Unit sometime after 7:00 p.m. intending to cut Wilhelm Wade's hair. (Pl. 56.1 ¶ 3.)  Dotson recalls that, when he arrived, only he and Wilhelm Wade were in the apartment.  (*Id.*)  At about 8:00 p.m., Dotson testified, he set out his hair cutting equipment.  (*Id.* ¶ 4.)  Wilhelm Wade then received a call from Se'Mone Wade, who asked him to pick her up from a local Chicago Transit Authority station, and Wilhelm Wade departed in order to do so.  (*Id.*)  At this point, Dotson testified, he went to the Wades' back porch in order to smoke a cigarette as he waited for the Wades to return.  (*Id.* ¶ 5.)  Dotson claims to have remained on the porch until Defendants arrived at the apartment. (*Id.* ¶ 7.)

Just before officers entered the unit, Dotson heard two loud banging noises that seemed to him to be coming from downstairs.  (*Id.*)  These were, Plaintiffs contend, the sounds of officers breaching the front doors of both the Wade Unit and the Johnson Unit simultaneously.  (Pl. Resp. Ind. Def. MSJ [294] at 27.)  Contrary to the officers' testimony, Dotson avers that no one ran through the apartment when Defendants entered.  (Dotson Dep. at 102, Ex. Q. to Def. 56.1.)  Moreover, Dotson testified that due to a condition called "avascular necrosis," he is unable to run or move quickly himself.[7]  (Pl. 56.1 ¶ 6.)  Immediately after hearing the banging noises, Dotson

---

[6]    In their response brief, Plaintiffs assert repeatedly that the search took two hours or more, without citation to the record.  (Pl.'s Resp. [294] at 21, 22, 27, 28.)  In Plaintiffs' 56.1 Statement, they allege that the search lasted "up to two hours," and cite to 14 exhibits.  (Pl. 56.1 ¶ 14.)  The first 13 of these exhibits do not include any information regarding the length of the search.  (*See* ¶ 14, Ex.'s 3-14 to Pl. SOF; Dotson Dep. at 168-69, Ex. Q to Def. 56.1.)  In the last cited exhibit, Ramos's deposition, Ramos is asked how long the search lasted and responds, "I don't know. Maybe the whole search took maybe an hour. I don't know. I couldn't give you a time." (Ramos Dep. at 265.)  Why Plaintiffs would cite this testimony in support of their "two hour" time estimate is a mystery to this court.

[7]    As of the day the search warrant was executed, Dotson was scheduled for hip surgery, but cardiological issues have since prevented him from receiving clearance for this surgery.  (*Id.*; Dotson Dep. at 213.)

recalls seeing Pierre Nero sprint up rear stairs to the Wades' back porch, pursued by two officers. (*Id.* ¶¶ 8-9, 73-74.)  Dotson did not see anything in Nero's hands.  (*Id.* ¶ 13.)  It is at this point, Dotson testified, that he and Nero were detained.  (Dotson Dep. at 118.)  He claims not to have seen Terrell Johnson at any point on September 16, 2015.  (Pl. 56.1 ¶ 27.)

After being moved to the kitchen, Dotson recalls that multiple officers took all of the items out of his and Nero's pockets, setting them out on the stove.  (Dotson Dep. at 126.)  He disputes that the search uncovered narcotics or any other contraband on his person.  (Pl. 56.1 ¶ 24.) Dotson was then seated in the dining room.  (Dotson Dep. at 126.)  Later, according to Dotson, an unidentified officer moved him back to the kitchen and stated an intent to plant narcotics recovered from the Johnson Unit on Dotson's person in retaliation for Dotson's failure to "cooperate."  (Pl. 56.1 ¶ 16.)

### 3. The Wades

While the search was ongoing, Wilhelm and Se'Mone Wade arrived at the apartment building.  (Def. 56.1 ¶ 50.)  Neither was physically restrained, although they were prevented from entering the apartment building until the search was completed.  (*Id.* ¶ 51.)  Wilhelm and Se'Mone Wade recall being told that they were not free to leave, whereas Reina recalls telling both of them that they were free to leave, and Terzich also recalls that the Wades were told they could leave if they wanted to.  (Pl. 56.1 ¶ 18; Ind. Def. Resp. Pl. 56.1 [312] ¶ 18.)  Se'Mone Wade had a suitcase with her.  (Pl. 56.1 ¶ 20.)  Plaintiffs contend that Defendant Terzich searched this suitcase without Se'Mone Wade's consent, over her vocal objection.  (*Id.*)  Terzich denies searching the suitcase herself; she testified that another officer (she does not recall which one) asked to look inside, and Se'Mone Wade voluntarily unzipped the suitcase to show the officers its contents.  (Terzich Dep. at 66-69, Ex. 1 to Pl. 56.1.)

### 4. Other Relevant Facts

Prior to September 16, the apartment building was equipped with a multi-camera surveillance system that captured ingress to and egress from the building. (Pl. 56.1 ¶ 28.) The system's computer, monitor, DVR, and other equipment were stored in the basement. (*Id.*) On the evening of September 16, Officers Reina and Bonnstetter seized this equipment. (*Id.* ¶ 29.) Thereafter, CPD's Evidence and Recovered Property Section destroyed it. (Gill Dep. at 44-46, Ex. 2 to Pl. 56.1.) No cogent explanation has been offered for why this was done.

Neither Johnson, nor any other individual aside from Nero and Dotson, was apprehended at or around the apartment building. Wilhelm Wade knows Terrell Johnson "from the neighborhood," but there is no evidence that the two are friends, or that Johnson had been in the Wade Unit prior to the execution of the search warrant. (Def. 56.1 ¶ 78); (Pl. 56.1 ¶ 26.)

## C. Aftermath

The search resulted in damage to the front door of the apartment building, the front door of the Wade Unit, and the rear door of the Johnson Unit. (Def. 56.1 ¶ 55; Mecher Sr. Dep. at 29.). The rear door to the apartment's basement also appeared to Ramos and Frano to have been kicked in, although the record does not reveal by whom. (Ramos Dep. at 267; Frano Dep. at 281.) There is no record of damage to the front door of the Johnson Unit.[8] (Mecher Sr. Dep. at 66.)

Ramos prepared the arrest report for Dotson, who was later charged with possession of cocaine. (Def. 56.1 ¶ 44; Pl. 56.1 ¶ 21.) After Dotson spent one month in jail, a criminal court found no probable cause for Dotson's arrest and dismissed the charge. (*Id.* ¶ 30.)

---

[8] Plaintiffs contend that Mecher Sr. and Mecher Jr. found damage to the front door of the Johnson Unit. (Pl. Resp. Def. 56.1 [295] ¶ 55.). They cite to the Mechers' depositions, which in no way support this contention. The cited passage in Mecher Jr.'s deposition does not mention the front door to the first-floor apartment. (Mecher Jr. Dep at 33-34, Ex. H to Def. 56.1.) And the cited passage in Mecher Sr.'s deposition stresses that there was no damage to the front door to the first-floor apartment, directly contradicting Plaintiffs' contention. (Mecher Sr. Dep.

Terrell Johnson was later arrested on a separate narcotics charge. (Def. 56.1 ¶ 64.) Johnson was deposed by defense counsel in this case, but invoked his Fifth Amendment privilege to decline to respond to all relevant factual questions. (*See generally* Johnson Dep., Ex. K to Def. 56.1.)

## ANALYSIS

Plaintiffs claim that Defendants violated the Fourth Amendment by obtaining an invalid search warrant, executing the search unreasonably, and arresting and prosecuting Dotson without probable cause. Defendants move for summary judgment. Summary judgment is appropriate only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When considering a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

Plaintiffs' claims are all brought under 42 U.S.C. § 1983, which creates a private cause of action against any person who, under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Liability under Section 1983 is predicated upon fault, requiring a plaintiff to "demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Plaintiffs allege violations of the Fourth Amendment, as incorporated against the state through the Fourteenth Amendment, which prohibits "unreasonable searches and seizures" and requires that a warrant may only be issued "upon probable cause, supported by

---

at 66, Ex. G to Def. 56.1.) Again, Plaintiffs' citation of factual materials that provide no support for their contentions is a mystery.

Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

Specifically, Plaintiffs Wilhelm and Se'Mone Wade claim that the information provided by J. Doe was unreliable, and that officers knowingly omitted material information from the criminal complaint, depriving the search warrant of probable cause and rendering it invalid. The Wades further contend that probable cause deficiencies were apparent to officers executing the warrant, rendering the search itself unreasonable. And because the search was unreasonable, the Wades argue, the officers were unreasonable in seizing them during the search. Plaintiff Dotson contends, furthermore, that the officers unreasonably seized him by arresting him without probable cause.

In addition to denying that any Fourth Amendment violation occurred, the individual Defendants have invoked qualified immunity as a defense to these claims. Qualified immunity shields the individual defendants from liability under Section 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). To be clearly established, a law must be "'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

## I.  The Search Warrant

In Counts I and II of the Complaint, Plaintiffs Wilhelm and Se'Mone Wade charge that Defendants Ramos, Frano, and Reina searched the Wade Unit based on an invalid warrant.[9]

---

[9]  Although Plaintiffs originally brought Counts I and II against all individual defendants, they have agreed to the dismissal of those counts as to all Defendants other than Ramos, Frano, and Reina. (Pl. Resp. Ind. Def. [294] at 12.) Accordingly, the court dismisses Counts I and II as to defendants Bonnstetter, Garcia, Napoli, Raimondi, Morin, Roman, Terzich, Stuckert, and Reyes Jr.

Plaintiffs offer two bases for this contention.  First, Plaintiffs argue that Ramos, Frano, and Reina withheld information from Judge Walowski prior to her approval of the search warrant and that, if Defendants had disclosed this information, the search warrant would not have been authorized (Count II).  Moreover, Plaintiffs contend that the criminal complaint failed to establish probable cause on its face, so even though the search warrant was approved, Ramos, Frano, and Reina were unreasonable in relying on it (Count I).

### A.    Material Omissions

Plaintiffs first argue that the search warrant was invalid because Defendants Ramos, Frano, and Reina withheld material information from the issuing magistrate, Judge Walowski.  To survive summary judgment on this theory, Plaintiffs must identify evidence in the record indicating that a defendant omitted material facts knowingly, intentionally, or with reckless disregard for the truth.  *Suarez v. Town of Ogden Dunes,* 581 F.3d 591, 596 (7th Cir. 2009).  Facts are material if their omission was "necessary to the judicial officer['s] determination[] that probable cause existed."  *Id.* (quoting *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003)).

At the outset, it is apparent that Plaintiffs cannot prevail on this theory against Frano or Reina, as there is no evidence that either of them were meaningfully involved in preparing the criminal complaint or providing information to Judge Walowski.  It is uncontested that Ramos wrote the criminal complaint himself, and there is no evidence that any of its information was derived from investigative work done by other officers.  While Plaintiffs contend that Reina "reviewed the search warrant complaint and warrant before it was signed," they identify no support for this claim in the record.[10]  (Pl. Resp. Ind. Def. MSJ [294] at 16.)  And although Frano drove

---

[10]    Following the citation in Plaintiffs' briefing leads to another citation in Plaintiffs' response to the individual Defendants' Rule 56.1 Statement, to "Defs. Exh. 10 at 8-12."  There is no Defense Exhibit 10 in the record.  Defendants' Exhibit Z10 is a set of interrogatories submitted to Wilhelm Wade, one of the landlords.  (*See* Wade Answers to Interrog.'s, Ex. Z10 to Def. 56.1.) It does not mention Reina.  (*See id.*)  The court considered the possibility that Plaintiffs intended to cite to their own Exhibit 10, which includes Reina's responses to Plaintiffs' first set of requests to admit, but Reina does not admit that he reviewed or signed off on the criminal complaint.  (*See*

with Ramos to meet Judge Walowski, it is uncontested that Frano did not hear or participate in any conversation between Ramos, Judge Walowski, and J. Doe. There is simply no basis for a reasonable jury to conclude that either Frano or Reina omitted information from the criminal complaint or were aware of another officer's omissions. For that reason, both are entitled to summary judgment on Count II.

For Plaintiffs' claim against Ramos to survive summary judgment, Plaintiffs must identify relevant facts, of which Ramos was aware, whose omission from the criminal complaint was essential to the magistrate's finding of probable cause. Plaintiffs allege nine purported material omissions: (1) that J. Doe was a paid police informant, (2) that J. Doe was previously convicted for crimes of dishonesty, (3) that J. Doe was arrested and convicted for drug-related offenses after becoming an RCI, (4) that J. Doe had criminal charges pending at the time the search warrant was requested, (5) that J. Doe had previously lied to police officers, (6) that J. Doe's prior criminal activity disqualified Doe as a police informant, (7) that neither Ramos nor Frano had independently verified that Terrell Johnson resided at the target address, (8) that neither Ramos nor Frano had independently corroborated the presence of criminal activity at the target address, and (9) that neither Ramos nor Frano knew whether J. Doe had reviewed the criminal complaint. The court addresses these purported omissions in turn.

**Allegation (1)** finds limited support in the record. Notably, Plaintiffs' factual submissions on this score are again disappointing. Despite alleging several times in their brief that John Doe is a paid informant, Plaintiffs cite only pages in the record with no support for that assertion. (*See* Pl. Resp. Ind. Def. MSJ [294] at 9, 17; Pl. 56.1 ¶¶ 38, 39.) The court on its own found some evidence in support of it, however, on pages the Plaintiffs do not cite. (*See* Ramos Dep. at 128-

---

Reina Admissions, Ex. 10 to Pl. 56.1.) What Reina does admit is that "he has no information as to the information of [the search warrant]." (*Id.* at ¶¶ 17-18.)

29.) This passage of Ramos's deposition indicates that J. Doe was a paid informant, although not for the CPD, but instead for the Bureau of Alcohol, Tobacco, and Firearms ("ATF").

The court concludes, however, that Doe's having been paid by ATF is not material. Plaintiffs make no argument—legally-supported or otherwise—that it would have undermined Judge Walowski's probable cause determination. If anything, the fact that Doe was a trusted informant for another law enforcement agency may have bolstered his credibility. Because disclosure of this fact would not have negatively affected the probable cause determination, Ramos had no constitutional obligation to include it in the warrant complaint.

**Allegations (2)**, **(3)**, and **(4)** have no support in the record.

- Plaintiffs allege twice that J. Doe was convicted for crimes of dishonesty, but provide no citation in either instance. (*See* Pl. Resp. Ind. Def. MSJ [294] at 9, 18.) Doe's criminal history reveals no crimes of dishonesty. (*See* J. Doe Criminal History, Ex. 18 to Pl. 56.1.)

- Plaintiffs allege that J. Doe was convicted for drug-related offenses after becoming an RCI, citing to passages in the depositions of Frano and Ramos. Frano testified only that he knew second-hand that Doe had been arrested since enrolling as an RCI in 2005, and that he did not know what the arrests were for or whether convictions followed. (Frano Dep. at 128-29.) Ramos, meanwhile, does not discuss Doe's criminal history in the passage cited by Plaintiffs. (Ramos Dep. at 131.) And although Doe's criminal history reveals a number of drug-related claims, the dates have been redacted. (J. Doe Criminal History.)

- Plaintiffs allege that J. Doe had criminal charges pending at the time the search warrant was requested, but provide no citation. (Pl. Resp. Ind. Def. MSJ [294] at 17.) The court is unaware of any support for this allegation in the record.

Moreover, none of these allegations, which Plaintiffs purport to pull from J. Doe's criminal history, could credibly support an argument that material information was withheld from Judge Walowski, because Judge Walowski was given a copy of J. Doe's criminal history. The criminal complaint that Judge Walowski signed expressly affirms that "J. Doe's criminal history, including possible pending investigations if any, have been presented to the undersigned Judge." (Search Warrant at 2.) Ramos also testified that he handed Judge Walowski a copy of J. Doe's criminal history,

and Plaintiffs have identified no evidence contradicting him.  Plaintiffs plainly cannot show that

any material fact related to J. Doe's pending and prior charges and convictions were withheld.

**Allegations (5)** and **(6)** are similarly unsupported by the record.

- Plaintiffs allege twice that J. Doe had previously lied to police officers, but provide no citation in either instance.  (*See* Pl. Resp. Ind. Def. MSJ [294] at 9, 18.)  The court is unaware of any support for this allegation in the record.

- Plaintiffs allege that J. Doe was disqualified as a police informant, citing to passages in the depositions of Frano and Ramos, as well as to J. Doe's criminal history.  (*See* Pl. 56.1 ¶ 38.)  None of the cited pages support Plaintiffs' claim.  In one of the pages in Frano's deposition to which Plaintiffs cite, Frano is asked whether Doe's arrests would have affected his status as an RCI, and Frano testified only that he did not know.  (Frano Dep. at 130.)

One might reason that a lack of factual support for these contentions should be excused because

Plaintiffs were not permitted to depose J. Doe.  But Plaintiffs do not raise this argument,[11] nor do

they contend that deposing J. Doe would substantiate their allegations.[12]  (*See generally* Def.'s

Resp. Pl. MSJ [294] at 11-12.)  Plaintiffs have not even directed the court to a single point during

discovery at which they asked a witness about these allegations, either in a deposition or an

interrogatory.  Following the court's ruling barring Plaintiffs from deposing J. Doe, the court

granted Plaintiffs leave to serve Ramos with supplemental interrogatories concerning his

experience with and knowledge of J. Doe, yet Plaintiffs chose not to do so.  (*See* March 7 Minute

Order [243].)  Absent any suggestion that there is a good-faith basis underlying **Allegations (5)**

and **(6)**, the court declines to read an issue of material fact into the record.

---

[11]     Plaintiffs do argue that, because they were not permitted to depose J. Doe, statements he purportedly made to officers should be excluded from consideration.  This argument is addressed in Section IB, *infra*.

[12]     Plaintiffs suggest that J. Doe would testify that he did not review the criminal complaint, and that Judge Walowski never asked him about the location where he bought drugs. (Def.'s Resp. Pl. MSJ [294] at 11-12.)  They do not suggest that deposing J. Doe would substantiate their claims regarding material omissions.

**Allegations (7)**, **(8)**, and **(9)** relate to the lack of corroboration or verification of J. Doe's claims. To be sure, the criminal complaint does not suggest that there was independent corroboration of criminal activity, nor does it aver that J. Doe reviewed the criminal complaint, but Plaintiffs contend that Ramos had an affirmative obligation to advise the judge that these steps were not taken. The Seventh Circuit has considered this argument before. In *Walker v. Weatherspoon*, a plaintiff brought a Section 1983 action against several police officers who performed a warranted search of his residence. 900 F.3d 354, 356 (7th Cir. 2018). A state judge had approved the warrant based on a tip that heroin was being sold from the house. *Id.* at 357. On appeal, Walker argued that the officers violated his Fourth Amendment rights by "withholding from the state judge the lack of corroboration" when requesting the warrant. *Id.* at 358. The Seventh Circuit unequivocally rejected this argument. Because the officer who signed the criminal complaint did not state that Doe's information had been corroborated, the court wrote, "a reasonable judicial officer . . . would have inferred that it had not been. Nothing was concealed from the judge . . . ." *Id*. So too here: because Ramos did not indicate that an officer had corroborated Doe's tip, Ramos did not "conceal" a lack of corroboration. And because Ramos did not indicate that Doe read the criminal complaint, he did not conceal a lack of verification.

As Plaintiffs have not identified any evidence from which a jury could conclude that Ramos was aware of a material fact and chose to omit it from the criminal complaint, Ramos is entitled to summary judgment on Count II.

### B. Probable Cause

Plaintiffs further argue that the warrant was invalid because the criminal complaint failed to establish probable cause. For a warrant to be valid under the Fourth Amendment, there must exist "probable cause that the evidence sought in the warrant will aid in obtaining a conviction of a particular offense." *Archer v. Chisholm*, 870 F.3d 603, 614 (7th Cir. 2017). A criminal complaint establishes probable cause if it "sets forth sufficient evidence to induce a reasonably prudent

person to believe that a search will uncover evidence of a crime." *Junkert v. Massey*, 610 F.3d 364, 367-68 (7th Cir. 2010) (quoting *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010)), *abrogated on other grounds as recognized in United States v. Miller*, 721, F.3d 435, 438-39 (7th Cir. 2013).

Here, it is uncontested that "the only source of criminal activity regarding the search warrant at issue stemmed from the J.Doe witness." (Def. 56.1 Resp. [312] ¶ 35.)  To determine whether an informant's tip is sufficient to establish probable cause, courts "consider the totality of the circumstances, focusing on five non-exclusive factors: (1) 'the level of detail,' (2) 'the extent of firsthand observation,' (3) 'the degree of corroboration,' (4) 'the time between the events reported and the warrant application,' and (5) 'whether the informant appeared or testified before the magistrate.'" *United States v. Musgraves*, 831 F.3d 454, 460 (7th Cir. 2016) (quoting *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014)).  The court has discretion to consider any pertinent factor, and "no one factor necessarily dooms a search warrant." *United States v. Johnson*, 655 F.3d 594, 600 (2011).  Additionally, "[t]he law affords 'great deference' to the probable cause finding made by the judge who evaluated the warrant application in the first instance." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1057 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Where, as here, officers invoke the defense of qualified immunity, Plaintiffs must do more than demonstrate that the warrant lacked probable cause.  An officer who executes an invalid warrant "is still entitled to qualified immunity if she is acting pursuant to a warrant that was authorized by a judge and her action is reasonable." *Archer v. Chisholm*, 870 F.3d 603, 614 (7th Cir. 2017).  To prevail over Defendants' qualified immunity defense, Plaintiffs must demonstrate that either "(1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer would

have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Junkert*, 610 F.3d 364 at 369 (quoting *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002)). Plaintiffs have not identified a case with facts similar enough to those present here to satisfy the first option. Their argument instead falls into the second category— that the criminal complaint was "so lacking in indicia of probable cause as to render . . . belief in its existence unreasonable." *Archer*, 870 F.3d at 603 (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

### 1. Motion to Exclude

As a threshold issue, Plaintiffs contend that the court should test whether the search warrant was based on probable cause without reference to information relayed by J. Doe—which in this case would effectively amount to excluding the criminal complaint entirely—because Plaintiffs were not given the opportunity to depose J. Doe. In evaluating this argument, the court recognizes, first, that the government has a qualified privilege to bar disclosure of the identity of confidential informants unless the opposing party shows her need for the information outweighs the need for confidentiality. *See Roviaro v. United States*, 353 U.S. 53, 60 (1957); *United States v. McDowell*, 687 F.3d 904, 911 (7th Cir. 2012). Defendants relied on this privilege in withholding J. Doe's identity during discovery, and the court denied Plaintiffs' motion to compel. Plaintiffs now move to exclude all of J. Doe's statements, arguing that their use absent an opportunity to depose J. Doe would cause unfair prejudice.

Plaintiffs cite *Manning v. Buchan*, a *Bivens* case from this district in which the plaintiff alleged that defendant FBI agents framed him for kidnapping and murder. 357 F. Supp. 2d 1036 (N.D. Ill. 2004). At trial, the agents in *Manning* sought to introduce inculpatory information relayed by unnamed informants that, they intended to argue, provided a valid basis to investigate the plaintiff. *Id.* at 1046. The court noted that "[t]hough [the plaintiff] obviously could take the stand himself and deny the informants' claims, that alone does not give him a fair opportunity to rebut

the defendant's evidence," and found that this limitation caused him unfair prejudice. *Id.* at 1048. Highlighting that the plaintiff had provided "evidence from which a fact finder reasonably could determine that some of the now-disclosed informants against him were prodded to fabricate information," the court granted a motion to exclude the evidence under Federal Rule of Evidence 403. *Id.* at 1048 n.3, 1049.

The facts here do not compel the same result. Rule 403 permits the court to exclude evidence if its probative value is *substantially* outweighed by the danger of unfair prejudice arising out of its admission. FED. R. EVID. 403. The probative value of J. Doe's statements is obvious: they provide a basis for Judge Walowski's finding of probable cause to issue a search warrant. But the danger of unfair prejudice here is minor as compared with the situation in *Manning*. First, the record does not allow for any serious doubt that the thrust of J. Doe's story, as relayed by Ramos, was accurate. Before conducting the search, Ramos reported to Judge Walowski that J. Doe had purchased heroin in Terrell Johnson's apartment at 4131 W. Crystal Street; and later that day, police officers found a substantial amount of heroin in Terrell Johnson's apartment at 4131 W. Crystal Street. (Def. 56.1 ¶ 40.) The warrant authorized search of Johnson's apartment. not the Wades', meaning that to the extent J. Doe "fabricated" evidence, it was Johnson, not Wade, who was the target of the wrongdoing. The dispute is only over whether J. Doe actually told Ramos that Johnson's apartment was on the second floor, as Ramos reported. (Pl. Resp. Def. MSJ at 10-11.) Given the configuration of the apartment units and flights of stairs, the misinformation is, though regrettable, not surprising. And unlike the plaintiffs in *Manning*, the Plaintiffs here have not supported their insinuation that Ramos fabricated this detail. Indeed, contrary to Plaintiffs' suggestion that Ramos made this up "to justify after the fact that they went into the wrong apartment," it was written in the criminal complaint, and signed by a local judge after she cross-examined its purported source face to face. These circumstances do not demonstrate that the risk of unfair prejudice from these statements so substantially outweighs

their probative value as to warrant exclusion.  The court will consider all information presented to Judge Walowski in the criminal complaint to evaluate whether probable cause existed.

### 2. The *Glover* Factors

Consideration of the criminal complaint in light of the *Glover* factors, *see Glover*, 755 F.3d at 816, supports Judge Walowski's determination that probable cause existed.  At a minimum, the judge's determination on this issue would establish that Defendants have a qualified immunity defense, and thus the court need not reach Defendants' qualified immunity defense.  The criminal complaint provides a detailed account of Doe's first-hand observations of criminal conduct, made just two days prior to the issuance of the warrant.  It identifies the target individual by name—both his legal name and a pseudonym—describes a specific incidence of unlawful conduct in which the target individual sold the informant heroin, and sets forth the date on which this transaction occurred.  It identifies the target apartment building by its address and includes a brief description of the face of the building.  It notes that the relevant unit is on the second floor and that 20-50 bags of narcotics were seen in a closet within the unit's rear bedroom.  And it provides some information concerning J. Doe's relationship with the target, noting that Doe had purchased heroin from the target several times prior.  J. Doe subsequently appeared before Judge Walowski, who questioned Doe for at least five minutes before signing off on the warrant.

Plaintiffs note correctly that the criminal complaint does not state that J. Doe is reliable and includes no information about J. Doe's background as an informant.  Based on this fact, Plaintiffs argue that the criminal complaint "is devoid of information as to why [J. Doe] as a person should be considered credible and reliable."  (Pl. Resp. Ind. Def. MSJ [294] at 14.)  But, as the Seventh Circuit has held, a showing of reliability does not necessarily require information about the informant's background.  In *Edwards v. Jolliff-Blake*, the Seventh Circuit considered the validity of a search warrant issued under substantially similar circumstances. 907 F.3d 1052 (7th Cir. 2018).  The warrant there relied on information supplied by a J. Doe informant with no past

history of police cooperation, who relayed first-hand experience of purchasing heroin from the target house, and subsequently appeared before a Cook County judge to be cross-examined. *Id.* at 1057. Stressing that "[s]tatements from an informant of unknown reliability may serve to establish probable cause 'if, under the totality of the circumstances, a reasonable person might consider that the statements are worthy of credence,'" the Seventh Circuit affirmed that probable cause had been established. *Id.* at 1058 (quoting *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002)). The court explained: "That Doe lacked a track record of serving as a reliable police informant is far from disqualifying. Indeed . . . 'at the beginning of his work with the police, every informant necessarily provides information for the first time.'" *Id.* at 1057 (quoting *Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009)).

Here, too, the totality of circumstances supports a finding of probable cause. Plaintiffs' argument to the contrary relies on too narrow a definition of what makes an informant reliable. The facts in the criminal complaint that satisfy the *Glover* factors are, by definition, facts indicating that information relayed by Doe was reliable, because the *Glover* factors are designed to assess "[r]eliability, veracity, and basis of knowledge." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). Doe's testimony satisfied four of the five *Glover* factors, and Doe's appearance before Judge Walowski is particularly compelling: "[w]here an informant accompanies the officer and is available to give testimony before the judge issuing the warrant, that informant's presence adds to the reliability of the information used to obtain the warrant, because it provides the judge with an opportunity to 'assess the informant's credibility and allay any concerns he might have had about the veracity of the informant's statements.'" *United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995) (quoting *United States v. Causey*, 9 F.3d 1341, 1343 (7th Cir. 1993), *cert. denied*, 511 U.S. 1024 (1994)). The strength of this and the other *Glover* factors overcomes the lack of independent corroboration of Doe's claims. *See generally Glover*, 755 F.3d at 816 ("[T]he totality-of-the-circumstances approach means 'a deficiency in one may be compensated for . . . by some

22

other indicia of reliability.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 233 (1983)).  Significantly, the informant's tip in *Jolliff-Blake* was not independently corroborated either; the Seventh Circuit has been clear that no one factor dooms a warrant.  *Jolliff-Blake*, 907 F.3d 1058.[13]

Plaintiffs also argue that the criminal complaint's failure to "state how defendants Ramos and Frano made a determination that 'Swami' was Terrell Johnson" is "fatal to the warrant."  (Pl. Resp. Ind. Def. MSJ [294].)  This argument is both legally and factually unsupported.  The criminal complaint states that Ramos retrieved a photo of Johnson from a database in which Johnson's name was listed as "Johnson, Terrell AKA 'Swami.'"  (Search Warrant at 2.)  It elaborates that Ramos presented this photo to Doe, who identified the person in the photo as "Swami."  There is no colorable argument that this undermined probable cause.

Looking to the totality of circumstances presented to Judge Walowski, the court agrees that there was probable cause to search the second floor of the apartment located at 4131 W. Crystal Street.  Plaintiffs cannot carry their burden of proving that there was a constitutional violation.  Defendants are entitled to summary judgment on Count I.

## II.   Execution of the Search

Additionally, Plaintiffs Wilhelm and Se'Mone Wade contend that the individual Defendants executed the search warrant unreasonably.  Count III charges that the individual Defendants violated the Fourth Amendment by failing to abandon the search of the Wade Unit, and Count VI charges that the individual Defendants illegally detained Wilhelm and Se'Mone Wade while the search was ongoing.

---

[13]      The similarities between the Plaintiffs' legal arguments here and those rejected by the Seventh Circuit in *Jolliff* do not appear to be coincidences.  Plaintiffs' counsel also served as the plaintiff's counsel in *Jolliff*.  Indeed, some segments of the Plaintiffs' brief in this case appear to have been copied directly from one submitted to the district court in *Jolliff-Blake*.  *Compare, e.g.*, Pl. Resp. Ind. Def. MSJ [294] at 12-19 *with* Plaintiff's Memorandum of Law in Response and Opposition to Defendants' Motion for Partial Summary Judgment at 3-9, *Edwards v. Joliff-Blake*, 2017 WL 1134473 (N.D. Ill. Mar. 27, 2017) (No. 1:13-CV-04558), ECF No. 287.

## A.    Failure to Abandon

If, in the course of executing a search warrant, an officer finds that the warrant "plainly [does] not describe the location to be searched," the search must be terminated.  *See Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1059 (7th Cir. 2018) (citing *Guzman v. City of Chicago*, 565 F.3d 393, 397 (7th Cir. 2009)).  For example, where a warrant describes a single-family home but the officers arrive to find a multi-unit building, the Fourth Amendment requires that the officers abandon the search.  *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1059 (7th Cir. 2018).  Not all inconsistencies trigger a duty to abandon, however.  In *Joliff*, residents whose home was searched for drugs sued the searching officers under Section 1983 arguing, *inter alia*, that the officers should have abandoned the search soon after arrival.  *Id.* at 1055, 1059.  The residents noted "minor inconsistencies" between the description of their home in the criminal complaint and the condition in which the officers found it, and contended that the "small, cluttered [basement] area" was "inconsistent with it being a site to run a heroin operation."  *Id.* at 1059.  The Seventh Circuit rejected these arguments, holding that the officers "were not required to call off the search because the home did not fit the stereotype of a stash house."  *Id*.  Rather, the court held, "these small inconsistencies, pointed out with the benefit of hindsight, would not have given the officers good reason to believe they were searching the wrong home."  *Id*.

Plaintiffs list several observations that, they argue, should have prompted Defendants to realize they were searching the wrong location.  As with so many factual assertions already addressed, Plaintiffs have not identified record evidence in support of most of these alleged observations.  Indeed, the section of Plaintiffs' brief that addresses Count III does not include a single reference to the record.  Thus, Plaintiffs assert, without any support, that (1) "officers immediately realized the home did not have the indicia of a drug house and did not appear as the warrant described," (2) Wilhelm Wade "insisted to the police that they were in the wrong place," (3) officers "found mail for Terrell Johnson" in the Johnson Unit, and (4) the woman who claimed

to be Johnson's girlfriend told officers that Johnson lived in the lower unit (Plaintiffs repeat this claim four times). (Pl. Resp. Ind. Def. MSJ[294] at 20-21, 22, 26, 28.) No citations accompany any of these claims in Plaintiffs' briefs, and not one appears in Plaintiffs' 56.1 Statement. The court notes, in any event, that the fact that a location does not meet a stereotype for a "drug house" does not prompt a duty to abandon a search. *See Joliff-Blake*, 907 F.3d at 1059.

The court is aware of evidence that officers encountered a woman in the Johnson Unit who claimed to be Johnson's girlfriend, and that although there were drugs in plain view in the Johnson Unit, there were no drugs founds in the Wade Unit. At most, these are the sort of minor inconsistencies that the Seventh Circuit dismissed in *Jolliff*. They would not have provided any of the Defendants with reason to believe they were searching a different unit than the one identified in the search warrant. The warrant directed the officers to search the second floor of an apartment building located at 4131 W. Crystal Street for illegal drugs, and that is exactly what the officers did. The warrant described the building as "a brown brick apartment building," which matched the building the officers encountered at the address. It is uncontested that there are only two floors with apartments located at that address, and the Wade Unit is on the higher floor of the two. Moreover, there was a number "2" on the door of the Wade Unit at the time of the search. Even taking into account the fact that one must ascend a flight of stairs to reach the Johnson Unit, no reasonable jury could conclude from these facts that the officers should have known the Wade Unit was not the "2nd floor apartment" to which the search warrant referred.

The court recognizes that Ramos himself prepared the criminal complaint, and thus would have been privy to any inconsistencies between the search warrant's description of the subject premises and the premises itself, or between J. Doe's story and reality. This may have placed a unique constitutional obligation on him, distinct from that articulated in *Guzman* and *Jolliff*. The Second Circuit has held that when a magistrate has authorized a search warrant, but an officer thereafter uncovers new or correcting information that she knows or should know is material to

the original probable cause finding, the officer incurs a constitutional duty to seek the magistrate's determination of whether probable cause still exists. *See United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984); *see also Cooper v. Dailey*, No. 07-CV-2144, 2010 WL 1415986, at *5 n.2 (N.D. Ill. Mar. 31, 2010) (citing the rule announced in *Marin-Buitrago* approvingly). If Ramos observed new or correcting information that undermined Judge Walowski's probable cause determination, Plaintiffs could perhaps argue that Ramos violated the Fourth Amendment by proceeding with the search. Plaintiffs have not made such an argument, however, nor have they cited evidence that would support such a theory, and thus it is waived.

Defendants are entitled to summary judgment on Count III.[14]

### B.    Illegal Detention

An individual who is not free to leave his or her home while officers conduct a search is "seized" for Fourth Amendment purposes. *Jacobs v. City of Chicago*, 215 F.3d 758, 772 (7th Cir. 2000) (citing *Michigan v. Summers*, 452 U.S. 692, 696 (1981)). The Fourth Amendment does, however, permit officers executing a valid search warrant to detain any occupant of the subject premises for the duration of the search. *Muehler v. Mena*, 544 U.S. 93, 98 (2005). This is, the Supreme Court has held, a "reasonable action to secure the premises and to ensure [the officers'] safety and the efficacy of the search." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007). The officers' authority to do so derives in part from the warrant itself: where a magistrate affirms that there is probable cause to search a building, police have "reason to suspect that its occupants are involved in criminal activity." *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008).

---

[14]    Plaintiffs also contend that their belief that Defendants entered both the Johnson Unit and Wade Unit simultaneously creates "clear questions of fact" as to Count II. (Pl. Resp. at 19.) This belief is supported only by Dotson's recollection of multiple banging sounds when the officers first entered the Johnson Unit, and Plaintiffs' unsupported contention that the front door of the Johnson Unit sustained damage. To the extent Plaintiffs are attempting assert Johnson's Fourth Amendment rights vicariously, they lack standing to do so. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("Fourth amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted" (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969).).

Following this rationale, the Seventh Circuit has held that officers can briefly detain even an unknown individual who approaches a building about to be searched. *Id.* at 818-19. In *Jennings*, the individual parked approximately 35 to 50 feet away from an apartment about to be searched by a SWAT team. *Id.* at 817. An officer maneuvered his own car to prevent the individual from leaving, then approached the individual's car, at which point the officer saw narcotics in the individual's possession. *Id.* The Seventh Circuit affirmed that this brief detention was a reasonable exercise of the officers' "'unquestioned command of the situation'" to detain the individual "long enough to ensure that he was unarmed and uninvolved in criminal activity." *Id.* at 819 (quoting *Summers*, 452 U.S. at 702-03).

Wilhelm and Se'Mone Wade arrived at their apartment while a search was already in progress. Wilhelm Wade testified that an officer asked if he lived upstairs, and Wilhelm responded that he did. (Wilhelm Wade Dep. at 84.) Wilhelm Wade and Se'Mone Wade both testified that an officer then told them that they were not permitted to leave the premises for the duration of the search. (*Id.* at 177; Se'mone Wade Dep. at 67, Ex. L to Def. 56.1.) Several Defendants contest this allegation, and Wilhelm Wade testified that he would not have left even if he had been told he could. Nevertheless, Plaintiffs have created a triable issue of fact as to whether Wilhelm and Se'Mone Wade were seized.

In the court's view, however, the detention of Wilhelm and Se'Mone Wade would have been reasonable under these circumstances. Although neither of the two were inside the Wade Unit at the time the search began, the reasoning underlying *Muehler*, *Rettelle,* and *Jennings* applies with equal force to residents who by chance were not in the apartment at the search's inception. The warrant here reflects probable cause to believe that illegal narcotics were present in the Wade Unit, and Wilhelm Wade informed the officers that he lived in the Wade Unit. It was, thus, reasonable to detain Wilhelm and Se'Mone Wade for the remaining duration of the search.

Plaintiffs do not contest that *Jennings* applies to residents who return home while a search is in progress, nor do they argue that the length of their detention was unreasonable. Their only argument that the seizure was unreasonable is that the search was unsupported by probable cause. *See Jacobs v. City of Chicago*, 215 F.3d 758, 772 (7th Cir. 2000) ("[W]here a search is illegal and not supported by probable cause, the justification for using the search as the foundation for the seizure disappears . . . .") Because the court has concluded warrant was valid and supported by probable cause, Plaintiffs' challenge to the Wades' detention fails, as well.

The court grants summary judgment on Count VI.[15]

## III. False Arrest and Malicious Prosecution

Plaintiff Dotson has brought two Fourth Amendment claims against the individual Defendants: one for false arrest (Count IV) and another for false detention, incarceration, and malicious prosecution (Count V). Dotson alleges that he was framed for possession of cocaine, resulting in his arrest and incarceration.

It is uncontested that Dotson was handcuffed in the Wade Unit and searched by at least one officer. (Def. 56.1 ¶ 42.) It is also uncontested that Ramos, Bonnstetter, and Frano arrested Dotson for possession of cocaine. (Pl. 56.1 ¶ 22.) The core of the parties' dispute is whether the arrest was supported probable cause. Bonnstetter testified that he performed a search of Dotson's person, finding five plastic bags containing suspect narcotics in the front pocket of Dotson's pants. (Def. 56.1 ¶ 43.) No other Defendant recalls personally seeing suspect narcotics. (Pl. 56.1 ¶ 25.) Dotson disputes that there were any narcotics found on his person. (*Id.* ¶ 24.) And a criminal court later found that there was no probable cause for Dotson's arrest. (*Id.* at ¶ 30.)

---

[15] Plaintiffs additionally argue that "[t]he search and seizure of Se'Mone's suitcase, to which she objected, was also unconstitutional." (Pl. Resp. Ind. Def. MSJ [294] at 24.) The Complaint does not include a claim relevant to this allegation, and the court does not have occasion to consider it at this stage of the proceedings.

Recognizing that there is a genuine dispute of fact as to whether Dotson's arrest and prosecution were supported by probable cause, the arresting officers—Ramos, Frano, and Bonnstetter—have not moved for summary judgment on these counts. (*See* Ind. Def. Reply MSJ [311] at 15-16.) On this motion, the court is asked only to determine whether Dotson has a plausible case against the remaining individual Defendants: Reina, Garcia, Napoli, Raimondi, Morin, Roman, Terzich, Stuckert, and Reyes Jr. Dotson alleges that each of these officers are liable for "taking [Dotson] into custody or detaining him" or, in the alternative, for failing to intervene and prevent the conduct of Ramos, Frano, and Bonnstetter. As to Reina, Dotson further argues that supervisory liability applies.

To hold a defendant liable for a constitutional violation under Section 1983, a plaintiff need not show the defendant's "direct participation in the deprivation [of a constitutional right]." *Maltby v. Winston*, 36 F.3d 548, 559 (7th Cir. 1994) (quoting *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986)). Rather, a defendant may be held liable for acting or failing to act with a "deliberate or reckless disregard of plaintiff's constitutional rights," or where "the conduct causing the constitutional deprivation occurs at [the defendant's] direction or with her knowledge and consent." *Id*. But there must be *some* personal involvement with, or knowledge of, the constitutional violation itself. Section 1983 does not support *respondeat superior* liability, *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010), and "supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable"; there must be "reckless indifference," *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988). To hold an officer liable for failing to intervene in a false arrest, a plaintiff must demonstrate that the officer was "informed of the facts that establish a constitutional violation and ha[d] the ability to prevent it." *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003).

*Morfin v. City of East Chicago* illustrates these requirements. In *Morfin*, a plaintiff brought a Fourth Amendment suit against police officers and city officials, alleging that he had been

arrested without probable cause for disorderly conduct.  *Id.* at 997.  Although the Seventh Circuit acknowledged a genuine dispute of material fact as to whether probable cause had existed, it affirmed the district court's grant of summary judgment in favor of two defendants, citing their lack of personal involvement in the alleged constitutional violation.  *Id.* at 1000-02.  The first defendant was a police officer whose only involvement in the case was driving the plaintiff from a barbershop to a police station for booking after the plaintiff was arrested.  *Id.* at 1001-02.  This officer, the court held, was acting only as a "temporary custodian," which "does not suffice to hold [the officer] liable for the alleged constitutional violations against [the plaintiff]."  *Id.* at 1001.  The second defendant was a police chief who never saw or personally interacted with the plaintiff, and whose only knowledge of the situation was second-hand information that the plaintiff was disregarding police orders and attempting to interfere with a crime scene.  *Id.* at 1001-02.  This second-hand information, the court found, could not support a conclusion that the police chief "had knowledge that an unlawful arrest (or any other constitutional violation) was imminent."  *Id.* at 1001.  Although plaintiff alleged that the police chief may have been apprised of a different set of events, the court held that such "[s]peculation is insufficient to withstand summary judgment."  *Id.* at 1002 (quoting *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir.1996)).

Here, similarly, Dotson has failed to identify evidence that any defendant other than Ramos, Frano, and Bonnstetter had personal involvement with his arrest or prosecution.  Garcia and Napoli's depositions establish that one of them handcuffed and patted down Dotson immediately after he was apprehended in the Wade Unit, and there is evidence that Napoli, Stuckert, and Reyes Jr. were involved in guarding Dotson while he was detained.  (Pl. 56.1 ¶ 23.) But these facts are inadequate to demonstrate personal involvement in the alleged constitutional violations.  At most, they indicate that Garcia, Napoli, Stuckert, and Reyes Jr. acted as "temporary custodians" which, without more, cannot sustain a Section 1983 claim.  These officers were

expressly authorized to detain and search Dotson incident to the warranted search of the Wade Unit; Dotson's detention during that period was an act distinct from his subsequent arrest.

The record also fails to substantiate a failure-to-intervene claim. Dotson has not identified evidence suggesting that any of the remaining Defendants was aware of a constitutional violation being committed by a fellow officer. Dotson alleges broadly that all Defendants "knew that he had no drugs on him," but cites nothing in the record to support this contention as to most of the Defendants. (Pl. Resp. Ind. Def. MSJ [294] at 28.) The court agrees that Garcia or Napoli's admission that they patted down Dotson, combined with Dotson's allegation that unspecified officers searched his pockets at the start of his detention and found no contraband, creates a triable issue of fact as to whether one of them was specifically aware Dotson that did not have narcotics in his pocket. This does not amount to knowledge of an impending constitutional violation, however. In order to sustain a claim on this theory, Dotson would need to prove that Garcia or Napoli was also aware that Dotson was about to be arrested and prosecuted for possession of cocaine and had an opportunity to intervene to prevent it. Dotson has identified no evidence tending to prove either of these facts.

The court grants summary judgment on Counts IV and V for Reina, Garcia, Napoli, Raimondi, Morin, Roman, Terzich, Stuckert, and Reyes Jr. The court also grants the individual Defendants summary judgment on Count VII, which charges them with failure to intervene, and grants Reina summary judgment on Count VIII, which charges him with supervisory liability for unspecified Fourth Amendment violations.

## IV. *Monell* Liability

Lastly, in Count IX, Plaintiffs allege that the City of Chicago (the "City") is liable under *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978). Plaintiffs' theory centers on the CPD's use of J. Doe warrants which, Plaintiffs contend, permit the issuance of search warrants without probable cause.

In order to sustain a claim against a municipality under *Monell*, a plaintiff must demonstrate that "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 535 (7th Cir. 2005). None of the Plaintiffs can meet all three of these elements.

As discussed in Sections I and II, *supra*, Plaintiffs Wilhelm and Se'Mone Wade have not created a triable issue of fact as to whether they suffered a constitutional injury. This is an absolute bar to success on a *Monell* claim. *See Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) (holding that the plaintiff's "*Monell* claim fails because he did not suffer a constitutional injury and so has no basis to support a *Monell* claim"). Accordingly, the City is entitled to summary judgment on Count VIII against Wilhelm and Se'Mone Wade.

Dotson has created a triable issue of fact as to whether he suffered two constitutional injuries: false arrest and malicious prosecution. *See* Section III, *supra*. But there is no evidence in the record from which a reasonable factfinder could conclude that these alleged injuries were proximately caused by the policy Plaintiffs describe. Causation under *Monell* requires more than a direct link; the plaintiff must demonstrate that the municipality acted with the "requisite degree of culpability," and were the "moving force" behind the injury alleged. *Bd. of Cty. Comm'rs of Bryan Cty.. v. Brown*, 520 U.S. 397, 397 (1997). The municipality must have been able to foresee that, due to the policy, the constitutional violation that caused the Plaintiff's injury would result. *See Huffman v. Cty. of Los Angeles*, 147 F.3d 1054, 1059 (9th Cir. 1998); *cf. Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996) ("The element of proximate cause depends upon the concept of foreseeability.").

Although Plaintiffs assert that "the City of Chicago was one of the moving forces of the constitutional violations against plaintiffs Wilhelm Wade, Se'mone Wade, and Tirae Dotson," their

reasoning does not appear to extend to Dotson at all. (Pl. Resp. City MSJ [299] at 10.)  The policy they allege affects only the means through which CPD officers obtain search warrants; it says nothing about the decision to arrest or prosecute.  In decrying the harm caused by this alleged policy, Plaintiffs focus only on its effect on "the victim of an unreasonable police raid of his or her home."  (*Id.* at 11.)  They make no effective argument that the architects of this policy should have foreseen it leading to false arrests or malicious prosecutions.  The City is entitled to summary judgment on Count IX.

## CONCLUSION

Neither side wins great praise in this case.  Defendants' search of the Wade Unit, while not so baseless as to violate the Constitution, relied on faulty information of the target's residence that might have been corrected, had an officer attempted to independently verify it.  As a consequence, Defendants disrupted Wilhelm and Se'Mone Wade's lives, breaking down the front door of their home and searching their personal belongings for up to an hour, ultimately finding no evidence of criminal activity.  Defendant Ramos' attempt to gild the lily by suggesting, contrary to his earlier admission, that he provided more information to Judge Walowski than is reflected in the criminal complaint, is disappointing.  And defense counsel's continued insistence, without evidence, that narcotics were being "sold out of the Wade's[sic] second floor unit" is troubling, particularly given their clients' inexplicable decision to seize and destroy security camera footage from the apartment building before it could be subpoenaed.

With respect to this motion, Plaintiffs' submissions leave much to be desired.  Plaintiffs' attorney was granted three extensions of time to file her response to Defendants' motions for summary judgment.  (*See* ECF No. 280, 284, 287.)  Yet some segments of what she ultimately submitted are altogether devoid of relevant caselaw, and much of the authority that is cited is mischaracterized or off-point.  Equally troubling, the court has identified several instances in which factual allegations critical to Plaintiffs' claims are directly contradicted by the record.  And in

numerous instances, facts are asserted with no supporting citation at all. This is not an effective means through which to identify a dispute of material fact. To the extent the court's holding today is a positive one for Plaintiff Dotson, it is a product only of the facts in the record and the law, not of careful advocacy.

For the reasons stated herein, the individual Defendants' motion for partial summary judgment [262] is granted. The court grants summary judgment on Counts I, II, III, VI, VII, and VIII to the Defendants. The court additionally grants summary judgment on Counts IV and V to Defendants Reina, Garcia, Napoli, Raimondi, Morin, Roman, Terzich, Stuckert, and Reyes Jr. The City's motion for summary judgment in its favor on Plaintiffs' *Monell* claim [269] is granted. Status conference is set for April 2, 2019, at 9:00 a.m. The parties are encouraged to discuss settlement.

ENTER:

Dated: March 22, 2019

_____
REBECCA R. PALLMEYER
United States District Judge